UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| FABRIZIO GUZZO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:22-CV-15 PLC |
| | ) | |
| ERICA ANNE HANSEN, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER[1]**

This matter is before the Court[2] on Petitioner Fabrizio Guzzo's ("Father") Complaint for

Return of Minor Child pursuant to the Hague Convention on the Civil Aspects of International

Child Abduction (Hague Convention), October 5, 1980, T. I. A. S. No. 11670, S. Treaty Doc. No.

99-11, as implemented by the United States in the International Child Abduction Remedies Act

(ICARA), 42 U.S.C. § 9001 et seq.  [ECF No. 1]  Respondent Erica Hansen ("Mother") opposes

the complaint.  [ECF No. 9]  For the reasons set forth below, the Court grants Father's complaint.

I.      **Background**

Father, an Italian citizen, and Mother, a United States citizen, met in Fall 2009 in Baltimore,

Maryland, where Father was completing a postdoctoral fellowship at Johns Hopkins University

and Mother was participating in an artist residency program.  Father returned to Italy in January

---

[1] This is a minimally redacted version of the Court's full Memorandum and Order, which has been
filed under seal by Order of this Court pursuant to Eastern District of Missouri Local Rule 13.05.
[ECF No. 65]  This version accurately reflects the totality of the Court's reasoning and includes
all citations to the record.  The full Memorandum and Order is accessible to all parties.
[2] This Court has jurisdiction over the matter pursuant to 22 U.S.C. § 9003 and 28 U.S.C. § 1331.
The parties consented to the jurisdiction of the undersigned United States Magistrate Judge
pursuant to 28 U.S.C. § 636(c).

2010, but he and Mother maintained their romantic relationship long distance.  Mother moved to Cosenza, Italy to live with Father in July 2011, and their son G.G. ("Child") was born there in September 2011.

Mother, Father, and Child resided together in Cosenza for five years.  During that time, Mother and Child visited the United States once or twice per year, for weeks or months at a time. Mother was unhappy in Cosenza because, among other reasons, she had difficulty finding employment opportunities there.

When Child was five years old, Father accepted a one-year employment contract, with the potential for extensions totaling six years, with the European Commission's Joint Research Center. The family relocated to Seville, Spain in October 2016.  Although the family's original plan was to remain in Spain for one year, Father's employer renewed his contract twice, extending his employment to the maximum period of six years.[3]  Despite consistent efforts, Mother was unable to secure stable employment in either Italy or Spain.

The family lived together in a rental home in Seville for approximately two years.  As Mother and Father's relationship deteriorated, however, they divided the living space such that Mother and Child inhabited the main floor and Father resided on the second floor.  In October 2018, the parties separated, and Mother and Child moved to a farmhouse about fifteen minutes away.

Child attended a private international school in Spain for five years and, at times, Mother contemporaneously homeschooled him through the Francis Howell School District in the United States.  Child's primary language is English, but he also speaks Spanish and Italian.  In Spain, he

_____

[3] Father's employment contract, which is ineligible for renewal, will expire in October 2022.  At the trial, Father testified that he applied for a permanent position with the European Commission and, regardless of whether he gets it, he will remain in Seville.  [ECF No. 57 at 29]

participated in extracurricular activities, including soccer, horseback riding, swimming, and music lessons.  Child developed friendships with other children in Spain and continues to communicate with at least one friend there.  After moving to Spain, Mother and Child visited the United States once or twice for two to three weeks at a time.  Mother explained that these trips became shorter and less frequent due to Child's schooling, covid-19 travel restrictions, and Mother's financial situation.

After their separation in October 2018, the parties maintained an informal custody arrangement, pursuant to which Child stayed with Father two afternoons per week and alternating weekends, as well as holidays and vacations.  In October 2019, Mother filed a custody and child support case in Spanish court.  While the case was pending, the parties maintained their informal arrangement until at least Summer 2020, when Father took Child on extended trips to Italy and Asturias, Spain.  In September 2020, Child decided he no longer wished to stay with Father overnight, but they continued spending afternoons together.

In adjudicating the parties' custody matter, the Spanish Court ordered Mother, Father, and Child to undergo psychological evaluations with a private organization called Taxo.  In December 2020, Taxo completed a report, concluding that "the relationship between father and son has weakened gradually, being currently very deteriorated, which would not benefit the fact of forcing parent-child encounters without prior professional intervention."[4]  [ECF No. 1-1 at 8]    Taxo recommended the Spanish court award Mother custody and refer the case to the "Family Treatment Team."  [Id. at 9]

In a judgment dated May 4, 2021 ("Custody Judgment"), the Spanish court awarded:  (1) the parties joint parental authority; (2) Mother primary physical custody; and (3) Father

---

[4] The Court cites the translated documents Father filed along with his complaint.

3

progressive visitation.  [ECF No. 1-1]   In regard to Father's visitation, the Custody Judgement set forth three "stages," or escalating physical custody schedules, conditioned upon Father's successful participation in family counseling.   [Id.]   Additionally, the Custody Judgement provided:   "Neither party may transfer [Child] outside the national territory without the express consent of the other or, failing that, judicial authorization."   [Id. at 13]   Mother appealed the Custody Judgment.[5]

Father exercised his visitation rights under the first stage of the Custody Judgment, spending time with Child on Wednesdays and alternate Saturdays.  Father did not progress to the subsequent stages of visitation because he did not participate in family treatment counseling as directed by the Custody Judgment.[6]

In May 2021, Father filed an emergency motion requesting the Spanish court hold Child's passports to prevent Mother from removing him from the country.  The court denied Father's motion.

In late June 2021, Mother filed a request for the Spanish court's permission to relocate to the United States with Child.  After an evidentiary hearing, the court issued an order on July 31, 2021, stating that Mother's request "has to be flatly denied, and she has to resort to the relevant procedure in order to modify the custodial terms."[7]  [ECF No. 1-2 at 3]

During that summer, while Mother awaited the Court's decision on her request to relocate, Mother's landlord decided to sell the farmhouse in which she and Child were living.  Unable to

---

[5] Mother's appeal of the Spanish court's decision remained pending at the time of trial in this case.
[6] At trial, Father testified that he attempted to initiate treatment by going twice to the clerk of court and once to "the social services in Sanlucar la Mayor."  [ECF No. 57 at 58]  Mother, however, stated that Father "flat-out refused" to attend family therapy.  [ECF No. 57 at 139]
[7] The July 2021 order denying Mother's request did not contain the correct name, referring repeatedly to Mother as "Ester Garcia Valverde."  [ECF No. 1-2 at 1-5]  By order dated September 20, 2021, the court corrected Mother's name.  [ECF No. 1-2 at 11-14]

4

secure employment or housing in Seville, Mother and Child travelled to Malaga, Spain to stay with friends.  Malaga was approximately two and a half hours away from Seville by car.

Father did not see Child between July 22, 2021 and September 11, 2021, when Father traveled to Malaga with his mother and brother to celebrate Child's tenth birthday.  On September 13, 2021, Mother and Child travelled to St. Charles, Missouri.  Mother understood when she left Spain that she did not have the Spanish court's permission to remove Child from the country as required by the Custody Judgment.  Two days later, Mother emailed Father informing him they had moved.

Father reported Child's removal to the local authorities in Seville on September 17, 2021.  Approximately one month later, he filed a request in Spanish court for changes to the Custody Judgment, as well as a formal request for Child's return under the Hague Convention.  After a hearing, at which Mother was not present but was represented by an attorney, the Spanish court determined that Mother's "actions were contrary to law and illegal," provisionally withdrew Mother's custody rights, and granted Father exclusive custody.  [ECF No. 1-3]

In the United States, Mother and Child share a home with Mother's partner in St. Charles, Missouri.  Child attends public school, where he has made new friends, and he enjoys playing baseball and spending time with friends and family.  Father has maintained contact with Child by telephone and spent time with Child while he was in St. Louis for mediation and trial in this matter.

Father filed the instant action in January 2022 seeking Child's immediate return to Spain under the Hague Convention and ICARA.  [ECF No. 1]  The Court conducted a bench trial on June 13, 2022, at which Mother and Father testified.  [ECF No. 52]  The Court interviewed Child *in camera*.

II.     **Discussion**

Father's complaint seeks the immediate return of Child to Spain under the Hague Convention and ICARA. [ECF No. 1] Mother denies that her removal of Child from Spain was wrongful under the Hague Convention and ICARA. She further opposes Father's complaint on the grounds that: (1) Child's return to Spain presents a grave risk of harm; and (2) Child wishes to remain in the United States and has attained an age and level of maturity at which it is appropriate for the Court to consider his desires. [ECF No. 9]

"The Hague Convention 'was adopted in 1980 in response to the problem of international abductions during domestic disputes.'" Golan v. Saada, 142 S.Ct. 1880, 1888 (2022) (quoting Abbott v. Abbott, 560 U.S. 1, 8 (2010)). "It is the Convention's core premise that 'interests of children … in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" Monasky v. Taglieri, 140 S.Ct. 719, 723 (2020) (quoting Convention Preamble, Treaty Doc., at 7). Accordingly, the Hague Convention generally requires "the prompt return of a child to the child's country of habitual residence when the child has been wrongfully removed to or retained in another country." Golan, 142 S.Ct. at 1888. Importantly, the purpose of a proceeding under the Hague Convention is "not to establish or enforce custody rights, but only to provide for a reasoned determination of where jurisdiction over a custody dispute is properly placed." Barzilay v. Barzilay, 600 F.3d 912, 916-17 (8th Cir. 2010) ("Barzilay II") (internal quotation omitted).

The United States Congress implemented the Hague Convention in ICARA, 22 U.S.C. § 9001 et seq., which "permits a parent (or other individual or institution) seeking relief under the Convention to file a petition for return of a child in state or federal court, §§ 9003(a)-(b), and directs courts to 'decide the[se] case[s] in accordance with the Convention.'" Golan, 142 S. Ct. at 1889 (quoting 22 U.S.C. § 9001(b)(4)). "Under ICARA, the party petitioning for the child's return

6

bears the burden of establishing by a preponderance of the evidence that the child was wrongfully removed or retained." Id. (citing § 9003(e)(1)).  To establish a prima facie case for return of a child, a petitioner must show that:  "(1) immediately prior to removal or retention, the child habitually resided in another Contracting State; (2) the removal or retention was in breach of the petitioner's custody rights under the State's law; and (3) the petitioner was exercising those custody rights at the time of the removal or wrongful retention." Custodio v. Samillan, 842 F.3d 1084, 1088 (8th Cir. 2016) (quoting Barzilay v. Barzilay, 536 F.3d 844, 846 (8th Cir. 2008) ("Barzilay I")).

If a petitioner establishes a prima facie case, the child must be "promptly returned unless one of the narrow exceptions set forth in the Convention applies." Id. at 1089 (quoting 22 U.S.C. § 9001(a)(4)).  As relevant here, a respondent may defeat a prima facie case for return by demonstrating either:  (1) by clear and convincing evidence that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation,"; or (2) by a preponderance of the evidence that the child objects to being returned to habitual residence and has attained an age and degree of maturity at which it is appropriate to take account of his views.  22 U.S.C. § 9003(e)(2)(A)-(B).  "Absent a finding that an exception applies, a child determined to be wrongfully removed or retained must be 'promptly returned' to the child's country of habitual residence." Golan, 142 S.Ct. at 1889 (citing § 9001(a)(4)).

**A.  Father's prima facie case for return**

Father asserts that he has satisfied all elements of a prima facie case for return under the Hague Convention because he demonstrated that:  (1) Spain was Child's country of habitual residence; (2) Mother's removal of Child to the United States breached Father's custody rights;

and (3) Father was exercising those custody rights at the time of the removal.   [ECF No. 36] Mother does not dispute either that her removal of Child from Spain breached Father's custody rights or that Father was exercising those custody rights at the time of removal.   [See ECF No. 35 at ¶¶ 20-26, 29]   Rather, Mother asserts that the United States, and not Spain, was Child's country of habitual residence.

"The Hague Convention does not define the term 'habitual residence.'"   Monasky, 140 S. Ct. at 726.   However, the Supreme Court articulated several principles for determining habitual residence, which is "a fact-sensitive inquiry, not a categorical one."   Id.   "A child 'resides' where [he] lives," but his "residence in a particular country can be deemed 'habitual'… only when [his] residence there is more than transitory."   Id.   In general, "[t]he place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence."   Id.; see also Cohen v. Cohen, 858 F.3d 1150, 1153 (8th Cir. 2017) (habitual residence "is determined as of the time 'immediately before the removal or retention'").   While "no single fact … is dispositive across all cases," habitual residence requires "some degree of integration by the child in a social and family environment."   Id. at 726-27.   Other factors relevant to the habitual-residence determination include:   "the settled purpose of the move to the new country from the child's perspective, parental intent regarding the move, the change in geography, the passage of time, and the acclimatization of the child to the new country."   Barzilay II, 600 F.3d at 918 (quotation omitted).

"The 'settled purpose' of a family's move to a new country is a central element of the habitual residence inquiry."   Id. (citing Silverman v. Silverman, 338 F.3d 886, 898 (8th Cir. 2003) (en banc)).   "This settled purpose need not be to stay in a new location forever, but the family must have a 'sufficient degree of continuity to be properly described as settled.'"   Id. (quoting Silverman, 338 F.3d at 898).   "The Eighth Circuit determines settled purpose from the child's

8

perspective, although parental intent is also taken into account."   Cohen, 858 F.3d at 1153 (quotation omitted).

Additionally, "[f]or older children capable of acclimating to their surroundings, … facts indicating acclimatization will be highly relevant."   Monasky, 140 S. Ct. at 727.   In regard to acclimatization, courts consider the following factors:  "a change in geography combined with the passage of an appreciable period of time, age of the child, immigration status of child and parent, academic activities, social engagements, participation in sports programs and excursions, meaningful connections with the people and places in the child's new country, language proficiency, and location of personal belongings."   Id. at 727 n. 3 (internal quotations omitted).

Here, the family moved to Spain from Italy in October 2016, along with their dog and most of their belongings.  Mother and Father decided to move to Spain because Father accepted a one-year employment contract with the potential for extensions totaling six years.  Mother, Father, and Child lived together in Spain for two years.  When Mother and Father separated, Mother and Child moved to a nearby house and remained in Spain another three years.

During his five years in Spain, Child learned Spanish, attended school, developed friendships, had a pediatrician, and participated in activities, including, soccer, horseback riding, and swimming.  According to Child's *in camera* statements, he understood at the time of the move that the family would live in Spain for one year, which is a significant period of time for a five-year-old child.  From Child's perspective, prior to his September 2021 removal to the United States, his parents' settled purpose was to create a home in Spain. See, e.g. Silverman, 338 F.3d at 888-89 (the district court "should have determined the degree of settled purpose from the children's perspective, including the family's change in geography along with their personal possessions and pets, the passage of time, the family abandoning its prior residence and selling the

house,…the children's enrollment in school, and, to some degree, both parents' intentions at the time of the move to Israel.").

When considering "settled purpose," a court also "should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared." Gitter v. Gitter, 396 F.3d 124, 134 (2d Cir. 2005). Mother and Father agreed to leave Italy and relocate as a family to Spain in October 2016. Mother and Father's testimony revealed that, while they did not anticipate living in Spain permanently, they intended to reside in Spain for one to six years, a significant amount of time in the life of a child. See, e.g., Feder v. Evans-Feder, 63 F.3d 217, 224-25 (3d Cir. 1995) (four-year-old child's habitual residence was Australia where he lived with his parents for six months before his mother returned with him to the United States). Moreover, Mother and Father "did what parents intent on making a new home for themselves and their child do – they [rented] a house, pursued interests and employment, and arranged for [Child's] … schooling." Id. at 224. Based on the record, the Court finds Mother's and Father's shared intent, "at the latest time their intent was shared," was "to fix the child's residence" in Spain.

Additionally, the evidence demonstrates that Child acclimated to his surroundings in Spain. See Monasky, 140 S. Ct. at 726; Babcock v. Babcock, 503 F.Supp.3d 862, 876 (N.D. Iowa 2020). As previously discussed, Child lived in Spain for five years (or half of his life), spoke Spanish, and attended school, participated in extracurricular activities, socialized with friends, and had a pediatrician in Spain. Child was integrated into the social environment and his residence in Spain was more than transitory. See, e.g., Barzilay II, 600 F.3d at 919; Babcock, 503 F.Supp.3d at 876.

Mother asserts that, despite living in Spain for five years prior to his removal, Child's habitual residence was the United States. In support, Mother points to evidence that his English is stronger than his Spanish, he attended an international school, he has significant family

10

relationships and friendships in the United States, and he regularly visited the United States. While this evidence clearly establishes that Child had a meaningful connection to the United States, it does not overcome the ample evidence that Child was "at home" in Spain "at the time of removal." Monasky, 140 S. Ct. at 727.

To the extent Mother suggests that the United States is Child's habitual residence because he has acclimatized to this country since his September 2021 removal, her position "run[s] contrary to the purpose of the Convention." Anderung v. Anderung, No. 4:13-CV-80 JEG-CFB, 2013 WL 12142385, at *13 (S.D. Iowa May 22, 2013) (citing Mota v. Castillo, 692 F.3d 108, 115-16 (2d Cir. 2012)). "A removing parent 'must not be allowed to abduct a child and then – when brought to court – complain that the child has grown used to the surrounding to which they were abducted.'" Silverman, 338 F.3d at 901 (quoting Friedrich v. Friedrich, 78 F.3d 1060, 1068 (6th Cir. 1996) ("Friedrich II")).

Based on the above, the Court finds that prior to being brought to the United States, Child's country of habitual residence was Spain. Accordingly, Father established a prima facie case under the Hague Convention. The burden now shifts to Mother to establish an affirmative defense to Child's prompt return. See, e.g., Golan, 142 S. Ct. at 1889; 22 U.S.C. § 9003(e).

**B.  Mother's Affirmative Defenses**

Mother asserts two affirmative defenses in an effort to defeat Father's prima facie case under Article 13 of the Hague Convention. First, Mother claims that returning Child to Spain would expose him to a grave risk of psychological harm or otherwise place him in an intolerable situation. Second, she claims that Child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take his views into account.

**1.  Grave Risk**

11

Mother claims that the "harm that [Child] would suffer upon return to Spain would be unreasonable and grave within the meaning and purpose of the Convention." [ECF No. 32 at 18] More specifically, Mother argues that returning Child to Spain would cause him psychological harm because: (1) Child "does not wish to return to Spain and lacks any sufficient degree of accommodations there"; (2) Father "does not have a permanent home or stable, long-term employment in Spain"; (3) Mother "is unable to live or work in Spain because she is unable to secure the proper immigration status to do so"; and (4) return to Spain "would subject [Child] to … tumultuous custody proceedings[.]"[8]  [Id.]

Under Article 13(b) of the Hague Convention, a court "'is not bound to order the return of the child' if the court finds that the party opposing return has established that return would expose the child to a 'grave risk' of physical or psychological harm." Golan, 142 S. Ct. at 1891-92 (quoting Abbott, 560 U.S. at 10). "ICARA requires that a respondent opposing return of a child under Article 13(b) must establish this exception by clear and convincing evidence." Rydder v. Rydder, 49 F.3d 369, 373 (8th Cir. 1995); 22 U.S.C. § 9003(e)(2)(A).

The Eighth Circuit has recognized "two types of grave risk that are cognizable under Article 13(b)": (1) "cases in which a child is sent to a zone of war, famine, or disease'; and (2)

---

[8] In her answer and response to Father's first amended complaint, Mother asserted that "ordering the relocation of [Child] to Spain presents a grave risk of *physical* harm…." [ECF No. 30 at ¶ 24 (emphasis added)]  However, Mother does not suggest in either her pre-trial brief or post-trial proposed findings of fact and conclusions of law that a return to Spain exposes Child to the risk of physical harm.  [See ECF Nos. 32, 63]  In her testimony, Mother did not suggest that Father was violent or abusive to Child or that Child would be endangered by being in Father's presence.  While Child expressed discomfort with Father's "rough" physical interactions and complained that Father threatened to spank him, these allegations do not constitute "serious abuse or neglect."  See, e.g., Altamiranda Vale v. Avila, 538 F.3d 581, 587 (7th Cir. 2008) (contested evidence that the petitioner once struck the child with a video-game cord "fell short of meeting this demanding burden"); Bhattacharjee v. Craig, No. 4:21-CV-826 SEP, 2021 WL 4504376, at *4, n.7 (E.D. Mo. Oct. 1, 2021).  Based on Mother's testimony and the lack of evidence of physical abuse, the Court finds insufficient evidence to conclude that Father presents a grave risk of physical harm to Child.

"those involving serious abuse or neglect."[9]  Vasquez v. Colores, 648 F.3d 648, 650 (8th Cir. 2011) (citing Silverman, 338 F.3d at 900).  Importantly, "[t]he potential harm must be severe, and there must be a probability that the harm will materialize."  Ermini v. Vittori, 758 F.3d 153 (2d Cir. 2014) (internal quotation marks omitted); see also Walsh v. Walsh, 221 F.3d 204, 219 (1st Cir. 2000) ("the harm must be a great deal more than minimal"); Babcock, 503 F.Supp.3d at 882 ("'grave' means more than serious risk").  "General evidence of harm is insufficient to satisfy Article 13b."  Acosta v. Acosta, 725 F.3d 868, 875 (8th Cir. 2013) (citing Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 376 (8th Cir. 1995)).  "*[A]djustment* problems that would attend the relocation of most children" are likewise insufficient to satisfy the grave-risk requirement.  Friedrich II, 78 F.3d at 1067 (emphasis in original); see also Antunez-Fernandes v. Connors-Fernandes, 259 F.Supp.2d 800, 815-16 (N.D. Iowa 2003).

Here, Mother presents evidence of neither "war zone, famine, or disease" nor "serious abuse or neglect."  Instead, Mother relies on general evidence that Child has a closer relationship with Mother than Father, prefers living in the United States, and will suffer emotionally if required to return to Spain.  Mother's evidence and argument goes to Child's best interests, a question of custody properly considered by the courts in the country of habitual residence, in this case, Spain. See Vasquez, 648 F.3d at 650 ("it is not relevant who is the better parent in the long run, or whether [the respondent-mother] had good reason to leave her home … and terminate her marriage to [the petitioner-father]"); Forcelli v. Smith, No. 20-699 JRT/HB, 2020 WL 5015838, at *9-10 (D. Minn. Aug. 25, 2020).  The grave-harm exception "does not give the court in the abducted-to country a license to speculate on where the children would be happiest; that decision is a custody matter and

---

[9] A grave risk of harm in the event of return may also exist where a child's health condition requires medical treatment that is not available in the country of habitual residence.  See Leonard v. Lentz, 297 F.Supp.3d 874, 893-94 (N.D. Iowa 2017), aff'd 748 Fed. Appx. 87 (8th Cir. 2019).

is reserved to the court in the country of habitual residence." <u>Antunez-Fernandes</u>, 259 F.Supp.2d at 816.

Furthermore, the psychological hardship attendant with being required to live in the nonpreferred county with the nonpreferred parent does not rise to the level of harm contemplated under the Hague Convention. The harm must be "something greater than would normally be expected on taking a child away from one parent and passing him to another." <u>Nunez-Escudero</u>, 58 F.3d at 377 (quotation omitted). <u>See also</u> <u>Whallon v. Lynn</u>, 230 F.3d 450, 459 (1st Cir. 2000) (same); <u>Friedrich II</u>, 78 F.3d at 1068 ("The disruption of the usual sense of attachment that arises during most long stays in a single place with a single parent should not be a 'grave' risk of harm for the purposes of the Convention.").

Mother also argues that Child's return to Spain will expose him to grave risk of harm because Father's housing and employment in Spain are unstable.  As an initial matter, the Court notes that this is not the type of harm contemplated by Article 13(b)'s grave-risk exception.  <u>See, e.g.</u>, <u>Friedrich II</u>, 78 F.3d at 1068 ("even *if* the home of [father-petitioner] were a grim place to raise a child…that fact would be irrelevant to a federal court's obligation under the convention.") (emphasis in original).  Furthermore, the record does not support Mother's assertion that Father's housing situation in Spain is unstable.  In regard to his employment, Father testified that he had applied (and believed himself a "strong candidate") for a permanent position in Spain.  [ECF No. 29 at 223]  In the event he is not offered that position, Father intends to secure work as an independent contractor in Spain.  [<u>Id.</u> at 224]

Finally, Mother claims that "tumultuous custody proceedings" in Spain present a grave risk of psychological harm.  The purpose of the Hague Convention is to return a wrongfully removed or retained child to the country of his habitual residence for the purpose of allowing the courts of

14

that country to properly adjudicate custody.  See Vasquez, 648 F.3d at 650.  Although custody proceedings may be contentious, Mother has not provided any support for the proposition that exposure to even a contentious custody proceeding is the type of harm contemplated by the Hague Convention.  Accordingly, Mother failed to prove by clear and convincing evidence that return to Spain will expose Child to a grave risk of harm.

### 2.  Maturity of the Child

Finally, Mother raises the mature-child defense under Article 13.  Article 13 provides that a court "may refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."  Hague Convention, art. 13.  "Like all defenses under the Hague Convention, the court construes the mature child defense narrowly."  Custodio, 842 F.3d at 1089.

To prevail on the mature-child defense, a respondent must establish by a preponderance of the evidence that:  (1) "the child has attained an age and degree of maturity at which it is appropriate to take account of [his] views"; and (2) "that the child objects to being returned."  Id. (quoting Hague Convention art. 13).  See also Bhattacharjee v. Craig, No. 4:21-CV-826 SEP, 2021 WL 4504376, at *3 (E.D. Mo. Oct. 1, 2021).  Under unique circumstances, a mature child's objections can be the sole reason that a court refuses to a child's return to his habitual residence.  Id. (citing Tsai-Yi Yang v. Fu-Chang Tsui, 499 F.3d 259, 278 (3d Cir. 2007)).  "However, a court must apply a stricter standard in considering a child's wishes when those wishes are the sole reason underlying a repatriation decision and not part of some broader analysis, such as whether the child would suffer a grave risk of harm if returned to his or her habitual residence."  Yang, 499 F.3d at 278-79 (internal quotation omitted).

### a.  Age and degree of maturity

Mother asserts that, "[d]espite the fact that [Child] is ten years old, it is clear that he possesses an age and degree of maturity beyond that of a typical ten-year-old boy."  [ECF No. 63 at 17]  As evidence of Child's maturity, Mother points to the Court's interview with Child, in which Child communicated his desire to remain in the United States.  Father agrees that Child "is a polite, intelligent 10-year-old boy," but maintains that "nothing [in the record] suggests [Child] is exceptionally sophisticated or has reached an age of maturity beyond his years sufficient for his views to be considered."  [ECF No. 64 at 30]

"There is no age at which a child is automatically considered mature [for purposes of the Hague Convention] – the determination must be made on a case-by-case basis."  Dubikovskyy v. Goun, No. 2:20-CV-4207 NKL, 2021 WL 456634, at *7 (W.D. Mo. Jan. 7, 2021) (citing Yang v., 499 F.3d at 279).  Courts generally base the assessment of a child's maturity on personal observations of the child, and intelligence alone is not sufficient to satisfy the maturity requirement.  See, e.g., Dietz v. Dietz, 349 Fed. Appx. 930, 934-35 (5th Cir. 2009) (children aged thirteen and nine were not sufficiently mature for their views to be taken into account); Yang, 499 F.3d at (ten-year-old described as "borderline genius" was "not of sufficient age or maturity for her views to be appropriately considered."); Babcock, 503 F.Supp.3d at 881 (twelve-year-old was "bright, articulate, and friendly" but not sufficiently mature for the Court to consider his wishes); Haimdas v. Haimdas, 720 F.Supp.2d 183, 207 (E.D. N.Y. 2010) (respondent failed to prove that "intelligent" child "two months shy of his tenth birthday" was sufficiently mature for the court to take his views into account); Bhattacharjee, 2021 WL 4504376, at *4 (thirteen-year-old was confident, friendly, and articulate but did not exhibit maturity beyond that of a typical thirteen-year-old).  Cf. Dubikovskyy, 2021 WL 456634, at *4-9 (respondent established the mature-child exception where twelve-year-old was "substantially above-average intellectually," had "a well-

16

developed sense of responsibility for her sister and the feelings of other people," articulated concerns that were "not superficial or childish," and "recognized that the choice before her was not black and white and did not wish to harm her father.").

During his *in camera* interview, Child described Spain as "nice" but stated "there's not really much to do there[.]"  [Id. at 6]  However, when discussing the farmhouse where he lived with Mother in Spain, he said it was "really awesome…. There's just a lot of things to do there. My friends would always come over." [ECF No. 58 at 11]  Child stated that, while living in Spain, he enjoyed doing crafts with his friends, playing soccer, and riding horses.  [Id. at 19]  While Child generally liked the other students at his Spanish school, he felt he did not learn a lot there.  [Id. at 12]

Child explained that his relationship with Father suffered after his parents' separation, and he disliked his Father's "rough" physical interactions with him.  [ECF No. 58 at 14-15]  When Father visited Child in the United States, Child was happy to see him.  [Id. at 16]  They spent time significant time together, and their activities included playing soccer, watching movies, and attending a professional baseball game.  [Id. at 16-17]  Child advised the Court that he wished to maintain a relationship with his father, but did not need to see him every day.  [Id. at 21]

In regard to his life in the United States, Child stated that he was able to spend time with his maternal grandparents and aunt, as well as friends he had known many years.  [Id. at 9-10]  Child also had a new best friend who lived next door.  [Id. at 13]  When the Court asked Child what he liked about living in the United States, Child replied that there are "a lot of things to do" and he especially loved playing baseball.  [Id. at 18]  In contrast, Child explained that he did not like the weather in Spain or its lack of baseball teams and public attractions like the St. Louis Zoo and St. Louis Science Center.  [Id. at 20]  He reiterated that he wished to remain in the United

States because he had family and friends here and there is more "to do."  [Id.]

Child is intelligent and personable, but the record does not suggest that his opinions are those of an especially mature person.  To the contrary, Child generally exhibits the traits of a typical ten-year-old.  Based on his *in camera* interview, the main reasons he wishes to stay in the United States are his perception that there is more "to do" in the United States, he loves baseball, and he has family and friends in the United States.  While Child's reasons are sensible, they do not reflect a level of maturity beyond that of a typical ten-year-old.  "The fact that [Child's] responses reflected the interests and concerns of a perfectly normal child of his age is no discredit to him." See, e.g., Bhattacharjee, 2021 WL 4504376, at *5.  "But it is an *extraordinary* case when a child under the age of 16 is deemed mature enough for his objection to defeat a meritorious petition for his return under the Hague Convention."  Id. (citing Friedrich v. Friedrich, 983 F.2d 1396, 1403 (6th Cir. 1993) ("Friedrich I")).  The preponderance of the evidence in the record does not support Mother's claim that Child has reached sufficient maturity for a court to "take account of [his] views."

b.  Particularized objections to return

Although Mother's mature-child defense fails because she did not demonstrate that Child has attained an age and degree of maturity at which it is appropriate for the Court to take account of his views, the Court briefly addresses whether Child's objections to return are the type of "particularized" objections contemplated under Article 13.   Mother argues that Child communicated particularized objections to returning to Spain and not a mere preference for the United States.  [ECF No. 63 at 17]  Specifically, Mother asserts that Child "disliked living in Spain," "had little to no connections with Spain," and the "continuous unwanted physical contact by his father lead him to object to living in Spain."  [Id.]  Mother further claims that returning

Child to Spain "would again subject the child to uncertainty, as [Mother], the child's primary caretaker, is unable to work there and [Father] has no concrete employment plans upon the expiration of his contract."  [Id. at 18]

"A child's wishes or generalized desires, as opposed to concrete objections, are not sufficient" to support a mature-child defense.  Bhattacharjee, 2021 WL 4504376, at * 5.  See also Yang, 499 F.3d at 279 (concluding that child's "generalized desire to remain in Pittsburgh" was insufficient to invoke the exception").  As the Fifth Circuit explained:

> The text of the Convention restricts the age and maturity exception to cases in which the child "objects" to being returned.  A preference is not an objection. This is not a matter of magic words or talismanic language.  There is a substantive difference between preferring to live in one of two countries – when living in either country would be acceptable – and affirmatively objecting to returning to one country – when living in that country would be unacceptable. Only an objection is sufficient to trump the Convention's strong presumption in favor of return.

Rodriguez v. Yanez, 817 F.3d 466, 476-77 (5th Cir. 2016).  "Likewise, a child's preference for one parent over another is insufficient."  Babcock, 503 F.Supp.3d at 880 (quotation omitted). "[T]he district court's finding that a child has or has not objected is a 'fact-intensive' determination that is based in part on the court's personal observations of the child."  Custodio, 842 F.3d at 1089.

Here, Mother failed to demonstrate that Child expressed a particularized objection to returning to Spain.  Contrary to Mother's assertion that Child "disliked" living in Spain, he did not communicate dislike for Spain so much as a preference for the United States.  Child complained about Spain's weather and stated that there was "nothing to do there," but he also reported that the home he shared with Mother was "awesome" and there were "a lot of things to do there."  While he enjoyed soccer in Spain, he loved baseball and wished to continue playing.  Again, this constitutes a general preference rather than a particularized objection.  Child's general complaints about Spain do not suggest that "living in that country would be unacceptable."

19

Mother also emphasizes the strength of Child's "connection" to the United States. Understandably, Child enjoys living near his family and friends in the United States. However, this is not an objection to living in Spain but rather a general preference for living in the United States. Moreover, it is worth noting that Child also had close friends in Spain, including a best friend with whom he and Mother stayed in Malaga. Child's closeness to and preference for family and friends in the United States does not render living in Spain "unacceptable." See Bhattacharjee, 2021 WL 4504376, at *6.

In regard to Child's discomfort with Father's "rough" physical interactions, the Court is sympathetic to Child's feelings. However, the preference for one parent over another is not sufficient to overcome the Hague Convention's presumption in favor of return. See Babcock, 503 F.Supp.3d at 880. Furthermore, while it appears that Child and Father's relationship has suffered as a result of Mother and Father's separation and Child's geographical distance from Father, there is nothing in the record to suggest that the relationship is irreparable, or importantly, abusive. To the contrary, Child verbalized a desire to maintain his relationship with Father and appeared to have enjoyed the time they recently spent together. Cf. Custodio, 842 F.3d at 1091 (district court did not clearly err in finding that the child's statements constituted objections within the meaning of the mature child defense where the child feared his father, who had "previously struck him and his brother," "would not visit [his father] even if he was required to return to Peru," saw his father "only sporadically prior to leaving Peru," had "barely any relationship" with his father, and had no contact with him since arriving in the United States).

The Court appreciates Mother's position that returning Child to Spain would subject her and Child to "uncertainty," as Mother struggled unsuccessfully to secure stable employment in Spain and Father's continued employment remains unsure. However, these considerations are not

accurately described as Child's "objections."  Moreover, even if uncertainty were an objection identified by Child, it is not sufficient to overcome the presumption in favor of return, especially given the stricter standard applied when a child's wishes are the only defense to repatriation.  See Custodio, 842 F.3d at 1089.  Applying the "stricter standard," where, as here, the mature-child defense is the sole defense to return, the Court finds that Mother failed to demonstrate by a preponderance of the evidence that (1) Child has attained an age and degree of maturity for the Court to "take account of his views" within the meaning of the Hague Convention and (2) Child objects, within the meaning of relevant case law, to being returned to Spain.

### III.    Conclusion

For the foregoing reasons, the Court finds that Mother wrongfully removed Child from Spain, his country of habitual residence, in violation of Father's custody rights.  The Court further finds that Mother failed to prove any affirmative defenses preventing Child's return.  Accordingly, Child shall be promptly returned to Spain.

Accordingly,

**IT IS HEREBY ORDERED** that Father's complaint seeking return of minor child [ECF No. 1] is **GRANTED**.

**IT IS FURTHER ORDERED** that Child shall be returned to Spain, his country of habitual residence at Mother's expense at a reasonable date and time mutually agreed upon by the parties.

**IT IS FURTHER ORDERED** that Mother shall make all necessary arrangements associated with returning Child to Spain.

**IT IS FURTHER ORDERED** that Mother shall not, absent leave of this Court, remove Child from the Eastern District of Missouri pending his return to Spain.

**IT IS FURTHER ORDERED** that counsel for Mother shall file a notice with the Clerk

21

of Court immediately upon Child's arrival in Spain indicating that Mother has fully complied with the terms of this Order.

**IT IS FINALLY ORDERED** that no award of attorney fees or other costs, apart from the aforementioned transportation costs associated with Child's return, will be made at this time.  The Court will consider any separate requests for attorney fees that Father may file, upon motion properly made.

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 3rd day of August, 2022